IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

RAHIM HYSA,

    Plaintiff,

vs.

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

    Defendant.

No. C04-2091

**ORDER**

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits (docket number 11). The parties consented to exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 3). The court finds in favor of the plaintiff and against the defendant and the matter is remanded for an award of benefits.

PROCEDURAL BACKGROUND

Rahim Hysa applied for Title XVI supplemental security income benefits on July 9, 2001, alleging an inability to work since June 1, 2001, due to mental or psychological difficulties including depression and post traumatic stress disorder, pain in his arms, hands, legs and hips, and tension headaches. His application was originally denied and denied again on reconsideration. A hearing before Administrative Law Judge (ALJ) Thomas M. Donahue was held January 29, 2003. A supplemental hearing for the purpose of eliciting testimony from a vocational expert was held on March 10, 2004. In an opinion dated June 24, 2004, the ALJ denied benefits. On October 12, 2004, the Appeals Council denied

1

Plaintiff's request for review. This action for judicial review was timely filed on December 14, 2004.

## FACTUAL BACKGROUND

The plaintiff was born May 12, 1944. (Tr. 80). He has a high school level education, which was completed in Yugoslavia. (Tr. 91). He is married and lives with his wife, his youngest son, and his youngest son's family. (Tr. 318). He has previously worked as a cashier, a commercial cleaner, and a laundry worker. The plaintiff also worked as a school secretary from 1969 until 1999 in Kacanik, Kosovo. (Tr. 138).

The plaintiff was seen by Dr. David Buechel on January 23, February 27, and March 13, 2001. (Tr. 152, 153, 155). On each occasion, Dr. Buechel noted that the plaintiff complained of having pain in his arms and hands and of hearing voices in his head. On February 28, 2001, Dr. Harold Trief completed a report following a CT scan of the plaintiff's head which was completed to further evaluate his complaints of headaches. (Tr. 160). Dr. Trief's report indicated that the CT scan was normal. (Tr. 160).

Psychologist Ralph Scott completed a report on September 22, 2001, following a psychological evaluation of the plaintiff. (Tr. 162-65). Dr. Scott's report included the following observations:

> [The plaintiff] reported perceptual disturbances since initiation of the Kosovo war; he hears unusual voices whose sources he cannot identify; the voices are 'terrible' and involve war: when sleeping or relaxing, [the plaintiff] often envisions dead people and senses people are behind him and seek to hurt him. He also has racing thoughts which, as he described, involve past experiences such as Serbian police killing his wife's father, two brothers and neighbors.. . . During this assessment [the plaintiff] was mildly depressed and anxious. . .

(Tr. 162). Dr. Scott opined that the plaintiff was of "average intelligence, who presented "evidence of the work ethic," and accordingly, "could succeed in competitive employment if on-the-job accommodations were implemented, such as supportive supervision and

2

assignment to low skill work which requires little knowledge of English." (Tr. 164). He further opined that while the plaintiff "cannot remember and understand English information provided to him in instructions, procedures and locations," the plaintiff was "of average intelligence [and could] handle job tasks if nonverbal instructions [were] provided." (Tr. 164). Dr. Scott's diagnostic impressions of the plaintiff included post traumatic stress disorder, depressive disorder not otherwise specified, impaired right elbow, headaches, insomnia, impaired testicles, history of tuberculosis, cultural issues, and limited reading materials. (Tr. 164). Dr. Scott assigned the plaintiff a global assessment functioning score of 57. (Tr. 164).

On November 8, 2001, Dr. David Kirkle wrote a report concerning the plaintiff following his orthopedic examination of the same day. (Tr. 166-67). Dr. Kirkle noted that the plaintiff reported "some headaches that he gets several times a week . . . which are sharp to dull [with] no throbbing." (Tr. 167). Dr. Kirkle's impressions of the plaintiff included the following:

> [l]eft elbow lateral epicondylitis . . . [h]eadaches of a musculoskelatal nature . . . [ and a] lesion to his right frontal scalp [which Dr. Kirkle believed to be] benign.

(Tr. 167). Dr. Kirkle opined:

> As far as [the plaintiff's] capabilities, I don't really see any restrictions on this individual after he gets his epicondylitis taken care of. He just needs to get into a physician here in the area and get treated for that. Temporarily, he would not be able to do any real gripping or twisting with that hand or lifting over probably about five pounds, or picking up anything in a palm-down position, but his left hand is capable and I see no problem with standing at work, walking and sitting. I see no problems with stooping, climbing, or crawling. No other problems with handling object[s], seeing, hearing, speaking, traveling, or environmental issues at this time. I believe the [plaintiff] just has a temporary acute condition that can be ameliorated and then the [plaintiff] should be able to go onto do pretty much anything in the work force.

(Tr. 167).

Dr. Jane Bibber completed a psychiatric review and a mental residual functional capacity assessment of the plaintiff on November 20, 2001, based on a review of his records. (Tr. 170-188). Dr. John Garfield also reviewed the plaintiff's records and concurred with Dr. Bibber's assessments. (Tr. 170, 186). Dr. Bibber opined:

> The major inconsistency in the record is that the [plaintiff] has not sought the assistance of a sponsoring agency, Lutheran Social Services, to treat his mental condition. The [plaintiff's] allegation regarding his mental condition is credible, as he does have, as of the 9/01 CE, the medically determinable mental impairments (MDI's) of Posttraumatic Stress Disorder and Depressive Disorder NOS. These MDI's can reasonably be expected to interrupt his concentration in the workplace to disturb his sleep.. . . The moderate limitations of needing demonstrated instructions and available supervisory support are reflected in the ratings on the MRFCA.

(Tr. 188).

Physician's Assistant Karen Franczyk saw the plaintiff on December 19, 2001. (Tr. 192). The plaintiff's complaints included an enlarging mole, headaches, and testicular pain. (Tr. 193). He was referred to dermatology for the mole, a CT was ordered for the plaintiff's headaches, and a urinalysis was ordered for the plaintiff's complaints of testicular pain. (Tr. 192). Ms. Franczyk scheduled a follow up visit with Dr. Sunita Bhattacharya. (Tr. 192).

Dr. Dennis Weis completed a medical consultant review for Disability Determination Services on December 23, 2001, based on a review of the plaintiff's records and based on his examination of the plaintiff. (Tr. 212). Dr. Claude Koons also reviewed the plaintiff's records and concurred with Dr. Weis' opinions. (Tr. 212). Dr. Weis opined, in relevant part:

> [the plaintiff's] physical exam is within normal limits. He has good diffuse range of motion . . . with the exception of 4/5 grip strength on the right due to some discomfort. It was felt additionally that he may not have given very good true effort. There is no evidence of any other physical impairments.. . . From a physical perspective, impairment would be non-severe.

4

The plaintiff was then seen by Dr. Bhattacharya for a follow-up visit on January 3, 2002, with complaints of chronic headaches which he described as a constant "beeping" in his head, as well as depression. (Tr. 191). Dr. Bhattacharya ordered further examinations, including an MRI and MRA, to evaluate possible causes of the plaintiff's headaches. (Tr. 191). Dr. Bhattacharya prescribed Paxil for the plaintiff's depression. (Tr. 191).

Dr. Ivo Bekavac saw the plaintiff on April 5, 2002, after the plaintiff was referred to Dr. Bekavac by Dr. Deb Johnson for further evaluation of his headaches. (Tr. 247). In evaluating the plaintiff's medical history, Dr. Bekavac noted that the plaintiff had been given Darvocet for headaches but that the medication made him too sleepy. (Tr. 247). He also noted that the plaintiff had been taking 20 mg. of Paxil for depression for three months, with no change in his symptoms. (Tr. 247). Dr. Bekavac's diagnostic impressions included tension-type headaches that were "likely part of depression," major depression, and small vessel intracranial ischemic disease that was "asymptomatic at this point." (Tr. 248). Dr. Bekavac noted that the plaintiff was being admitted to the hospital, following a discussion between the plaintiff and Dr. Darko Zdilar, in which the plaintiff admitted suicidal ideation. (Tr. 248). The plaintiff was then admitted to Allen Memorial Hospital in Waterloo, Iowa. (Tr. 299). He reported hearing voices and noises in his head and indicated that he had been employed somewhere in Cedar Rapids, Iowa, but that the "voices and music got louder" while he was working. (Tr. 299). He reported having felt depressed for more than six months and indicated that he had thoughts of jumping off of a bridge. (Tr. 299). The plaintiff also reported having problems with concentration. (Tr. 299).

Dr. Zdilar completed a discharge summary on April 9, 2002. (Tr. 296). The plaintiff's diagnoses included major depressive disorder (single episode), psychosis not otherwise specified, and headaches. (Tr. 296). Dr. Zdilar noted that the plaintiff had been

5

treated with medications including Zoloft and Risperdal. (Tr. 296). Dr. Zdilar directed the plaintiff to continue taking the medication and scheduled a follow-up visit. (Tr. 296).

The plaintiff was seen by Dr. Bekavac on April 22, 2002, for a follow-up examination. (Tr. 245). Dr. Bekavac recorded his impressions of the visit in a letter to Dr. Deb Johnson, also dated April 22, 2002. (Tr. 245). Dr. Bekavac noted that the plaintiff continued to "experience noise in his ears, but not hearing voices." (Tr. 245). Dr. Bekavac also noted that the plaintiff had been hospitalized for depression under the care of Dr. Zdilar. (Tr. 245). Dr. Bekavac's diagnostic impressions included Tinnitus, history of tension-type headaches (stable), major depression (stable), and small vessel intracranial ischemic disease (presumptively asymptomatic). (Tr. 245).

Dr. Bekavac saw the plaintiff on November 8, 2002, for a follow-up examination. (Tr. 244). Dr. Bekavac's impressions of the plaintiff included "[t]ension-type headaches with worsening," major depression, Tinnitus, depression with "some worsening according to the [plaintiff]," and small vessel intracranial ischemic disease, asymptomatic. (Tr. 244). Dr. Bekavac again saw the plaintiff for a follow-up examination on December 9, 2002. (Tr. 243). Dr. Bekavac noted that the plaintiff reported that his headaches were "well controlled" by Phrenilin Forte and the plaintiff denied any side effects from the medication. (Tr. 243). Dr. Bekavac also noted that the plaintiff felt that "his depression [was] stable." (Tr. 243).

Dr. Bhattacharya saw the plaintiff on December 12, 2002. (Tr. 239). The plaintiff's complaints included feeling tired, taking frequent naps during the day, difficulty with concentrating, memory problems, and depression. (Tr. 239).

February 18, 2003, records from Covenant Medical Center's sleep lab indicate that the plaintiff underwent a sleep study after reporting that he suffered from nightmares and night-time headaches and was sleeping more than twelve hours at night. (Tr. 253). The sleep study records indicate that when a technician entered the plaintiff's room during his sleep study in order to fix the electrodes connected to the plaintiff, he jumped from his

sleep, "acted very frightened [and] moaned a lot." (Tr. 253). It was also noted that during the sleep study the plaintiff "had arousals throughout the night [with] moaning, yelling, or groaning."

The plaintiff was seen by Dr. Bhattacharya on February 24, 2003, and reported that he continued to have problems with depression and sleeping. (Tr. 264). Dr. Bhattacharya recorded his impressions, in relevant part, as follows:

> Chronic fatigue and depression along with nightmares. We will try to contact Dr. Zdilar, I do think the Remeron is causing some fatigue but I am not sure if he is having post-traumatic stress disorder or needs a change in medication. The patient mentions he has been on Effexor and Zoloft in the past which haven't really helped either. We will see what Dr. Zdilar has to say.

(Tr. 264). Dr. Bhattacharya also opined that the plaintiff was suffering from a disordered sleeping pattern which may need to be treated with medication. (Tr. 264).

Dr. Bhattacharya saw the plaintiff on March 25, 2003. (Tr. 263). The plaintiff complained of headaches and waking up every two hours at night. (Tr. 263). The plaintiff also reported that he "always gets nightmares where he feels he is running away from somebody," that he had not been able to have restful sleep, and as a result, did not feel good. (Tr. 263). Dr. Bhattacharya's impressions included post-traumatic stress disorder and headaches. (Tr. 263). The plaintiff was then seen by Dr. Bhattacharya on May 19, 2003 with complaints of left groin pain. (Tr. 262). On June 13, 2003, the plaintiff was seen by Physician Assistant Karen Franczyk, of Dr. Bhattacharya's office, with complaints of continued right hip pain and episodes of dizziness. (Tr. 261).

Dr. Sharon Duclos completed a plan for outpatient rehabilitation concerning the plaintiff on June 20, 2003. (Tr. 282-84). She recorded that the plaintiff was in distress "secondary to pain" and that he had difficulty getting comfortable while sitting, frequently shifting his weight from the left to the right. (Tr. 283). Dr. Duclos' plan for therapy included ultrasound, passive range of motion exercises, home exercise program

7

instruction, progressive range of motion and strengthening exercises, and endurance training. (Tr. 282).

The plaintiff was seen by Dr. Bhattacharya on July 11, 2003 for a follow-up visit concerning pain in the plaintiff's left hip. (Tr. 258). The plaintiff reported that his medications made him sleepy and that he continued to have some back pain and left pelvic pain. (Tr. 258). The plaintiff was again seen by Dr. Bhattacharya on August 11, 2003 for a follow-up visit. (Tr. 258). The plaintiff reported that he continued to have problems with depression and headaches and was not sleeping well. (Tr. 258).

The plaintiff was seen by Dr. Gary Knudson on August 5, 2003, after being referred by Dr. Bhattacharya for evaluation of his left hip pain. (Tr. 250). Dr. Knudson recorded the plaintiff's complaints as follows:

> [the pain] has been present for six to seven months. No history of trauma. He also has some numbness and tingling down his leg. He complains of groin pain as well as upper lateral buttock area pain. The pain is constant. He tried medications, ice. Numbness or tingling distally and some radiating pain. Interferes with work and sports activities.

Dr. Knudson took some x-rays of the plaintiff's hip and found "some mild degenerative changes" as compared to previous x-ray film. (Tr. 251). Dr. Knudson's diagnostic impression was trochanteric bursitis of the left hip with possible radicular type pain. (Tr. 251). Dr. Knudson administered a cortisone injection to control the plaintiff's pain. (Tr. 251).

Physical Therapist John Hurley authored a report on August 27, 2003, concerning the plaintiff's physical therapy. (Tr. 270). Mr. Hurley's report included:

> [the plaintiff] was seen in outpatient physical therapy from 7-22-04 through 8-4-03 with left low back and left hip pain. He received ultrasound to the left thigh and groin region, as well as performing exercise in warm therapeutic pool. . . . He has not returned since 8-4-03, when he demonstrated continued antalgic gait and had also complained of headaches to the therapist . . . [m]ost of the time that the [plaintiff] presented

8

> we did not have the luxury of an interpreter to fully explain or interpret his comments or to interpret our comments. Goals for pain relief of the lft hip apparently were not achieved through the utilization of gentle home exercise stretches, ultrasound and aquatic exercises.

## CONCLUSIONS OF LAW

### Scope of Review

In order for the court to affirm the Administrative Law Judge's (ALJ) findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence which fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### ALJ's Determination of Disability

Determining whether a claimant is disabled is evaluated by a five-step process. See 20 C.F.R. § 404.1520(a)-(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

> The five steps are:
> (1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.
> (2) If the claimant is not engaged in substantial gainful activity, his medical condition is evaluated to determine whether his impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.
> (3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.
> (4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work he performed in the past. If the claimant is able to perform his previous work, he is not disabled.
> (5) If the claimant cannot do his previous work, the Secretary must determine whether he is able to perform other work in the national economy given his age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Bowen v. Yuckert, 482 U.S. at 140-42); 20 C.F.R. § 404.1520(a)-(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ determined that the plaintiff had not engaged in substantial gainful employment since June 1, 2001. At the second step, the

ALJ determined the plaintiff had the following impairments: post-traumatic stress disorder and depression, history of headaches, high-frequency sensory neural hearing loss, very mild chronic constructive pulmonary disease, and history of epicondylitis of the right upper extremity. At the third step, the ALJ determined that the plaintiff's impairments were not equivalent to one of the listed impairments. At the fourth step, the ALJ determined the plaintiff had the residual functional capacity to perform the physical exertional and nonexertional requirements of work except that he should perform a job with no contact with the general public and limited contact with fellow workers.

The ALJ determined that the plaintiff would be able to perform his past relevant work as a commercial cleaner and laundry worker. Therefore, benefits were denied.

### Subjective Allegations of Pain and Psychological Symptoms

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Id. In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id. at 1321-22. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

The plaintiff argues the ALJ improperly rejected his subjective complaints of pain and psychological symptoms. The court agrees to the extent that the ALJ improperly rejected the plaintiff's subjective complaints of psychological impairments stemming from his post-traumatic stress disorder, depression, and chronic fatigue.

The plaintiff has alleged that due to symptoms associated with his post-traumatic stress disorder and depression, such as difficulty with concentration, he is unable to work. The ALJ found that the plaintiff's allegation in this regard was "contradicted by the medical evidence" because on two occasions, in April and July, 2002, examining physicians found that the claimant had normal or good attention span and concentration. However, the examining physician who recorded the plaintiff's concentration and attention span as "normal" on April 5, 2002, Dr. Bekavac, was examining the plaintiff for treatment of headaches only. He deferred treatment of the plaintiff's mental health issues to Dr. Zdilar after noting that the plaintiff was to be admitted to the hospital for expressing suicidal ideation. The two occasions on which examining physicians found the plaintiff's concentration and attention span to be normal, relied upon by the ALJ in discounting the plaintiff's subjective allegations concerning his inability to concentrate, do not establish any inconsistency between the plaintiff's subjective allegations concerning his inability to concentrate and pay attention and the record as a whole.

The ALJ also discredited the plaintiff's subjective allegations after finding that the plaintiff had on at least one occasion been non-compliant with taking medication prescribed for his psychological symptoms. Specifically, the ALJ noted as follows:

> [o]n December 12, 2002, the [plaintiff] complained of an increase in symptoms. However, he was not taking the medication Wellbutrin daily, but only as needed. He was told to take the medication daily.

While it is true that Dr. Bhattacharya did advise the plaintiff to take the Wellbutrin daily after the plaintiff reported that he was only taking it on an as-needed basis, Dr. Bhattacharya also noted in his records of that visit that "some of [the plaintiff's] problems might be from medications and depression. We will have [the plaintiff] see Dr. Zdilar again and discuss these problems and see if a change in medication will help." Considered in context, the court finds that this occasion does not constitute non-compliance

with treatment of the kind which normally may undermine a plaintiff's subjective allegations of pain or symptoms.

The ALJ also discredited the plaintiff's subjective allegations of pain based on the plaintiff's reported daily living activities.[1] The plaintiff's reported daily living activities, which the ALJ found precluded a finding of disability, included (1) housekeeping, including the fact that the plaintiff had been cleaning his garage prior to one of his complaints of back pain; (2) attending an English as second language class; and (3) dressing himself "casually and appropriately." The ALJ also opined that the plaintiff's alleged problems with concentration and attention should be discredited because the plaintiff continued to drive, which the ALJ found "indicates a good ability to attend and concentrate which is necessary for him to be aware of, and respond appropriately to changing traffic situations, traffic signs, traffic signals, and so forth." The court finds that the plaintiff's reported daily living activities are minimal and do not undermine the reported level of severity of symptoms associated with the plaintiff's post-traumatic stress disorder and depression, including chronic fatigue, hearing voices and noises, and inability to concentrate.

The court finds that the ALJ erroneously discredited the plaintiff's subjective allegations of symptoms associated with his post-traumatic stress disorder and depression, as there are not inconsistencies in the evidence as a whole. See Polaski, 739 F.2d at 1322. Remand for further evaluation or vocational expert testimony is not necessary. The vocational expert testified in response to questions proffered by the plaintiff's representative at the March 10, 2004, hearing as follows:

> Q: (Plaintiff's representative) He does have some depression and some problems with concentration and some memory loss. Now would you have to keep up a pace in order to do [the

---

[1] The ALJ also opined that "[i]n light of inconsistencies, daily activities are likely greater than the [plaintiff] sought to indicate at the hearing."

> other jobs in the economy identified by the vocational expert], Mr. Marquardt?
> A: (Vocational Expert) These are all competitive jobs meaning that an individual is going to have to perform at a pace that is accepted by the employer as done by other workers performing the same types of duties. If the pace is slow, competitive employment cannot be performed.

The above testimony indicates the plaintiff's difficulty with concentration, due to his depression and post-traumatic stress disorder, precludes him from performing competitive work in the national economy in addition to his past relevant work. Accordingly, the ALJ's decision is reversed, and this matter is remanded for an award of benefits.

January 12, 2006.

                                                          _____
                                                          JOHN A. JARVEY
                                                          Magistrate Judge
                                                          UNITED STATES DISTRICT COURT